# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                                          Case No. 05-CR-107

DEMARIUS DEAN and
DARNELL ELLIS,

        Defendants.

## RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA ON THE DEFENDANTS' MOTIONS TO SUPPRESS

On April 12, 2005, the grand jury returned a single-count indictment against the defendants, Demarius Dean ("Dean") and Darnell Ellis ("Ellis"). The indictment charges the defendants with possession and intent to distribute 500 grams or more of cocaine. Dean and Ellis have each filed a motion to suppress the cocaine specified in the indictment, which was recovered pursuant to the search of a residence located at 3758 North 40th Street, Milwaukee, Wisconsin (the "40th Street residence").

On June 30, 2005, this court conducted an evidentiary hearing to address the defendants' motions. Assistant United States Attorney Mario Gonzales appeared on behalf of the government. Dean appeared in person and by his attorney, Matthew Ricci. Attorneys Michael F. Hart and Brian Kinstler appeared on behalf of Ellis, who also appeared in person. The pleadings on the

1

defendants' motions are now closed, and they are ready for resolution. A jury trial is scheduled to commence before the Honorable Rudolph T. Randa on October 18, 2005.

**I. Background**

At the June 30, 2005 evidentiary hearing, Federal Bureau of Investigation Special Agent, Enrique Carlton ("Agent Carlton"), Agent James Krueger ("Agent Krueger"), and City of Milwaukee Police Officer David Lopez ("Officer Lopez") testified on behalf of the government. Dean testified on his own behalf, and Ellis did not testify. Based on all of the testimony presented at the evidentiary hearing, as well as the parties' post-hearing submissions, it appears that many of the facts surrounding law enforcement officials' entry into the 40th Street residence, seizure of the defendants, and subsequent discovery of cocaine are not in dispute. A summary of those events follows.

<u>Garrity Investigation</u>

Agents Carlton Krueger testified that law enforcement officials were led to the 40th Street residence during the course of their investigation of a suspect named Daniel Garrity ("Garrity"). (Tr. 11, 32, 92-97.). On March 21, 2005, federal agents used a confidential informant to conduct a controlled purchase of cocaine from Garrity. The informant met with Garrity and was joined by an unidentified male who supplied the cocaine. After the cocaine sale, agents followed the unidentified male to the 40th Street residence. (Tr. 32.). The male, now identified as Mitchell Wilson ("Wilson"), entered the residence, remained there for a few minutes, and then left. (Tr. 95-97.). Agents followed Wilson for a time but eventually ceased their surveillance. (Tr. 96.).

A few days later, agents arranged a second controlled purchase between Garrity and a confidential informant. At the time, agents believed that Garrity would use the same source to obtain cocaine that he used the previous week. (Tr. 91.). Before the controlled purchase occurred,

2

however, Garrity was arrested. Agents tried to get Garrity to disclose his source of cocaine, but Garrity refused. (Tr. 93.).

### Knowledge Prior to the Knock and Talk

Because Garrity did not identify the cocaine source, agents decided to investigate the 40th Street residence further. Agent Carlton found that the listed tenant for the residence, Rufus Jackson, had two prior drug convictions. (Tr. 27.). Based on that information and the fact that the suspected cocaine source went to the 40th Street residence after the controlled buy, agents decided to conduct a "knock and talk" investigation at that location.

On March 29, 2005, five officers participated in the knock and talk investigation—Officer Chu, Officer Lopez, Officer McNeil, Agent Krueger, and Agent Ludington. Agent Krueger testified that he did not participate in the investigation prior to the knock and talk, but was told that the 40th Street residence was involved in drug trafficking activities. He took this information as truth. (Tr. 36-38.). Agent Krueger also testified that he knew that Garrity's suspected source went to the residence after the controlled purchase and that the listed tenant of the residence had two previous drug arrests or convictions. (Tr. 35, 47-50, 57-58.). Officer Lopez also testified that he was also informed that the 40th Street residence was involved in drug trafficking activities prior to the knock and talk. (Tr. 66-67.). In regard to the relationship between the 40th Street residence and the previous controlled cocaine sale, however, it appears that Officer Lopez erroneously believed that the purchase occurred at the 40th Street residence. (Tr. 84.).

### Knock and Talk Execution

Upon arrival at the residence, Officers McNeil and Chu approached the front door, Officer Lopez secured a side door, and Agents Krueger and Ludington positioned themselves at back of the residence. Officers McNeil and Chu knocked on the front door of the residence, identified

3

themselves as officers, said that they were investigating a lost child, and requested to enter the home. (Tr. 33, 66, 88.). Ellis answered the door and told the officers that he did not live there, that the owner of the residence was not home, that the agents could not come inside, and that the agents should come back later. (Tr. 33.). As this conversation was occurring, Officer Lopez says that he heard someone running through the house and down stairs. (Tr. 67.). Based on these sounds, contemporaneous to the discussion occurring at the front door, Officer Lopez notified the other officers that he believed persons within the residence were destroying evidence. (Tr. 67-69.). Officer Chu then joined Officer Lopez at the side door, where they forced entry into the residence. (Tr. 69, 88.). Upon entry, Officer Lopez went into the main living area of the first floor where he observed Ellis standing at the front door. Officer Lopez and the other officers then conducted a protective sweep of the first floor, checking it for other individuals that might endanger the officers. (Tr. 69-70.). While this took place, Agent Krueger had also entered the residence and was yelling that someone was in the basement. (Tr. 70.). Agent Krueger stood at the top of the basement stairs, and Dean eventually appeared at the bottom of the stairs. (Tr. 55.). The lighting in the stairwell leading to the basement was poor. Although Agent Krueger saw that Dean was holding something in his hand, he could not identify the object. Accordingly, Agent Krueger pointed his gun at Dean and told him to get on his stomach. (Tr. 55-56.). Once the other officers secured Ellis and completed a protective sweep of the first floor, Agent Krueger went downstairs, found that the object in Dean's hand was a cell phone, handcuffed Dean, and conducted a protective sweep of the basement. (Tr. 56.).

<u>Search Warrant and Cocaine Recovery</u>

During the course of their protective sweep of the first floor, the officers discovered cocaine residue on the bed and dresser in one of the bedrooms. (Ellis Pre-hrg. Br. at 4 and Post-

4

hrg Br. at 10 citing Agt. Carlton Aff. in support of search warrant ¶ 14.). Accordingly, the officers and agents sought a search warrant for the residence held Dean and Ellis in the kitchen until the search warrant issued. (Tr. 57.). As a result of the subsequent search, federal agents recovered a firearm and the cocaine specified in the indictment from the basement of the residence. (Gov. Resp. Br. at 2-3.).

**II. The Defendants' Motions to Suppress**

As grounds for their motions to suppress, Dean and Ellis claim that law enforcement officials entered the 40th Street residence without a warrant and without probable cause or exigent circumstances. The government now concedes that Ellis has standing to challenge officials' entry into the residence (Gov. Resp. Br. at 4.), but there is still a dispute as to Dean's standing. In the case that the court finds that Dean lacks standing to challenge the entry, Dean seeks to suppress the cocaine specified in the indictment on the grounds that it was obtained as a result of an unreasonable seizure of his person.

<u>Exigent Circumstances Standard</u>

It is well established that the physical entry of the home is the chief evil against which the Fourth Amendment is directed, warrantless entries and searches of a home are presumptively unreasonable. <u>United States v. Rivera</u>, 248 F.3d 677, 680 (7th Cir. 2001)(<u>citing</u> <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980)). Warrantless searches are constitutionally permissible, however, where (1) there is probable cause and (2) exigent circumstances create a compelling need for official action and insufficient time to secure a warrant. <u>United States v. Marshall</u>, 157 F.3d 477, 481-82 (7th Cir.1998); <u>Jacobs v. City of Chicago</u>, 215 F.3d 758, 769 (7th Cir. 2000).

In determining whether exigent circumstances justify the warrantless search of a residence, the court must analyze the situation from the perspective of officers at the scene, asking not what

5

police could have done but rather whether they had, at the time, reasonable belief that there was compelling need to act and no time to procure a search warrant. United States v. Marshall, 157 F.3d 477, 482 (7th Cir. 1998). The test is an objective one. United States v. Foxworth, 8 F.3d 540, 544 (7th Cir. 1993).

Where law enforcement officials justify their entry into a residence based upon the risk of imminent destruction of evidence, the court must ask whether "'the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" United States v. de Soto, 885 F.2d 354, 367 (7th Cir.1989)(quoting United States v. Rivera, 825 F.2d 152, 156 (7th Cir.1987).

Analysis of Probable Cause and Exigent Circumstances

After analyzing the facts and applying the legal standards, the court concludes that probable cause and exigent circumstances provided legal justification for law enforcement officials' entry into the 40th Street residence. Before the knock and talk investigation, officers and agents suspected that drugs would be found at the 40th Street residence. They knew that the listed tenant for the residence was previously convicted of drug trafficking offenses and they also knew that residence was somehow connected to the controlled cocaine purchase involving Garrity, a then unknown cocaine source, and a confidential informant. This information is more concrete and reliable than information gained from a mere anonymous tip, which triggers many of the knock and talk investigations that officers conduct. However, probable cause requires more than suspicion. Probable cause requires facts "sufficient to induce a reasonably prudent person to believe that a search . . . will uncover evidence of a crime." United States v. McNeese, 901 F.2d 585, 592 (7th Cir. 1990); Illinois v. Gates, 462 U.S. 213, 238 (1983)(probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular

place); United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir.1995)(same). In the present case, the cocaine source's connection to the residence was fairly tenuous. Officers knew that he was not the listed tenant for the 40th Street residence, and the source's visit to the residence lasted only a few minutes. In addition, the controlled buy that tied the residence to Garrity's cocaine source occurred eight days earlier. Thus, in absence of indications that the 40th Street residence was being used as a stash house, any drugs originally at that location might be gone by the time of the knock and talk, and the chance that drug records might be kept at the residence is slight. Moreover, while the listed tenant for the residence, Jackson, had prior drug convictions, the government offered no evidence as to when those convictions occurred, and officers did not believe that Jackson was the cocaine source. For these reasons, evidence that suggests drug trafficking activities at the 40th Street residence simply did not rise to the level required for probable cause. This is demonstrated by the fact that federal agents decided to conduct a knock and talk rather than seek a search warrant.

However, during the knock and talk, the circumstances changed significantly, and the officers' initial suspicions reasonably developed into probable cause and exigent circumstances. Ellis refused Officer McNeil's request to enter the residence, stating that he did not live there and that no resident was home. While citizens certainly have the right to refuse law enforcement officials' request to enter their home, officers are not obligated to ignore reasons for a refusal that they deem unusual or suspicious. Such was the case here. Based on his experience in drug trafficking investigations, Agent Krueger testified that Ellis' refusal to allow entry into the residence was suspicious because persons who deny residency during a knock and talk are commonly trying to disassociate themselves with the residence. Thus, "anything that's found in the residence can't possibly be theirs, because they don't belong there in the first place." (Tr. 39.).

7

Here, Agent Krueger testified that Ellis told officers he did not live there and no on that did was home. (Tr. 39.).

When considered in conjunction with the fact that Officer Lopez heard someone running through the house at the precise moment that entry was sought, a reasonably prudent officer now would have probable cause to believe that drugs were within the house and that the drugs would soon be destroyed. Thus, the sound of an individual running within the residence, contemporaneous with the officers' presence, and the other facts regarding drug trafficking, constitutes exigent circumstances as well as a basis for probable cause on these facts. United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994)(citing United States v. Talkington, 843 F.2d 1041, 1044 (7th Cir. 1988)("[t]he potential that evidence will be destroyed, especially drugs, gives rise to exigent circumstances"). In particular, given Garrity's recent arrest and his cocaine source's connection to the residence, the agents and officers could reasonably infer that, if individuals within the residence were involved in drug trafficking, their presence would cause panic and would trigger the rapid destruction of drugs. Drugs—unlike other forms of evidence—are particularly vulnerable to destruction within a moment's notice. Officer Lopez testified that he was quite familiar with this vulnerability based on his training and the many narcotics investigations in which he has participated while assigned to the vice control division. (Tr. 67.). In fact, Officer Lopez estimated that, in about half of the knock and talk investigations that he has participated in, entry into the residence is based on sounds that indicate persons within the residence are destroying narcotics. (Tr. 71.). In more than half of those instances, Officer Lopez was able to substantiate the destruction of evidence based on the discovery of narcotics or other evidence in toilets or sinks. (Tr. 79.).

Ultimately, if someone within the residence was running from room to room or downstairs, it stands to reason that all incriminating evidence could easily be gone within a matter of minutes or even a matter of seconds. Under those circumstances, there would be nothing left to discover had the officers waited for a warrant to be issued. Thus, entry occurred as soon as Officer Lopez conveyed what he was hearing to the other officers and Officer Chu joined him at the side door. If the officers were to act at all, they needed to do so quickly. That is exactly what happened. Accordingly, the court will recommend that the defendants' motions to suppress be denied as to this basis.

### Dean's Standing

Dean's motion to suppress should also be denied based on his lack of standing. For a defendant to claim the protection of the Fourth Amendment, he must first "demonstrate that he personally has an expectation of privacy in the place searched." Minnesota v. Carter, 525 U.S. 83, 88 (1998). Fourth Amendment rights are not infringed if a person "is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property." Rakas v. Illinois, 439 U.S. 128, 134, (1978).

In Minnesota v. Carter, the Supreme Court had occasion to discuss the circumstances under which persons who were in an residence during a search could claim the protection of the Fourth Amendment. The Carter defendants lived in Chicago and came to the residence at issue for the sole purpose of packaging the cocaine. They had never been to the apartment before and were only in the apartment for approximately two and a half hours. In return for the use of the apartment, the defendants gave the tenant one-eighth of an ounce of the cocaine. Carter, 525 U.S. at 85-86. In determining whether the defendants could invoke Fourth Amendment protections, the Carter court distinguished overnight guests, who are protected by the Fourth Amendment (as

9

typified by the guest in Minnesota v. Olson, 495 U.S. 91 (1990)), and those who were merely "legitimately on the premises." Based on the purely commercial nature of the transaction engaged in by the Carter defendants, the relatively short period of time that the defendants spent at the residence, and the lack of any previous connection between the defendants and the tenant, the defendants' situation was closer to that of one simply permitted on the premises. Carter, 525 U.S. at 91. Accordingly, any search that may have occurred did not violate the defendants' Fourth Amendment rights. Id.

In the present case, Dean was not an overnight guest but was not visiting Ellis for commercial reasons. Thus, whether Dean may rely on the Fourth Amendment is not as clear as it was in Carter or Olson. Dean argues that he had a reasonable expectation in the 40th Street residence based on United States v. Rhiger, 315 F.3d 1283, 1287 (10th Cir. 2003). The Rhiger court held that the defendant had a reasonable expectation of privacy in his friend's residence because he was regularly present at the residence, stayed overnight at the residence on several occasions, kept receipts at the residence, was comfortable entering the house without announcing himself, and took naps at the residence. Id. at 1287. Under the circumstances, Rhiger had an "ongoing and meaningful connection" to the home. Id.

Dean has not established such a relationship with the 40th Street residence. At the evidentiary hearing, Dean stated that he and Ellis are childhood friends and that he stayed overnight at Ellis' previous residence. In the opinion of the court, this does not translate to an expectation of privacy at the 40th Street residence. Ellis previously resided with his mother, who Dean thought of as his "second family." (Tr. 105-106.). While Dean might have had somewhat of an expectation of privacy at the previous residence, the court cannot infer that the same expectation of privacy would exist once Ellis moved out of his mother's home and shared an

10

Case 2:05-cr-00107-RTR    Filed 09/29/05    Page 10 of 13    Document 43

apartment with Jackson (who Dean might not even have known). In fact, during the time that Ellis lived at the 40th Street residence, Dean never stayed overnight. (Tr. 106.). The only evidence specific to the 40th Street residence was that Dean visited Ellis to play video games and to hang out. (Tr. 107.). This is not the "ongoing and meaningful connection" that resulted in the Rhiger holding. There is no indication that Dean came and went as he pleased, kept belongings at the residence, or casually took naps there. There is no evidence that the residence served as Dean's "home away from home" and, while Dean was legitimately on the premises, that connection is insufficient to invoke the protections of the Fourth Amendment. Accordingly, Dean's motion to suppress based on the officers' entry into the residence should be denied on this basis as well.

### Dean's Seizure

In light of this determination and the legal justification for officers' entry into the 40th Street residence, the only remaining issue is whether suppression is warranted because Dean was unlawfully seized. In that regard, the court's primary concern is that Dean's seizure appears to be unrelated to the cocaine residue that was observed by the officers and that led to the search warrant. During the course of their protective sweep of the first floor, the officers discovered cocaine residue on the bed and dresser in one of the bedrooms. (Ellis Pre-hrg. Br. at 4 and Post-hrg Br. at 10 citing Agt. Carlton Aff. in support of search warrant ¶ 14.). Dean was seized in the basement. Moreover, Dean was seized by Agent Krueger, who was stationed at the top of the basement stairs and did not participate in the protective sweep of the first floor. Thus, the court cannot conclude that the cocaine specified in the indictment was the "fruit" of Dean's seizure, even assuming that the seizure was unreasonable.

Moreover, it is clear that Agent Krueger's seizure of Dean was reasonable. Agent Krueger testified that he could not see Dean clearly and that Dean was holding something in his hand. Agent Krueger was concerned that the object may be a weapon. These concerns were reasonable given that the residence was forcibly entered, Agent Krueger was advised that the individual in the basement might be destroying narcotics, and, at that time, Agent Krueger did not know whether other individuals were present in the residence. Out of concern for his safety and the safety of the other officers and agents, it was reasonable for Agent Krueger to hold Dean at gunpoint until the residence was secured and backup officers could assist Agent Krueger in removing Dean from the basement. By the time that happened, officers had already discovered the cocaine residue in the bedroom and were seeking a search warrant. Although it took several hours for the search warrant to be issued, there is no indication that Dean was unduly detained or was treated inappropriately during the detention. Thus, as to this alternative basis for suppression, Dean's motion will also be denied.

For all the reasons discussed, the court now enters the following recommendation on the defendants' motions to suppress:

**IT IS THEREFORE RECOMMENDED** that Dean's motion to suppress be **denied.**

**IT IS FURTHER RECOMMENDED** that Ellis' motion to suppress be **denied.**

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned

to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2005.

s/AARON E. GOODSTEIN
United States Magistrate Judge

13